Marie ZAKARIAN and Ovsanna Zakarian, Plaintiffs,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA and Massachusetts Indemnity and Life Insurance Company, Defendants.

No. 84 C 91.

United States District Court, N.D. Illinois, E.D.

Jan. 20, 1987.

Supplement to Opinion Feb. 19, 1987.

Peter D. Kasdin, Philip J. Nathanson, Chicago, for plaintiff.

Joseph J. Hasman & James B. Davidson, Peterson, Ross, Schloerb & Seidel, Chicago, for Prudential.

Kim L. Kirn, Lord, Bissell & Brook, Chicago, for Massachusetts Indem.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

Marie Zakarian ("Marie") and her daughter Ovsanna Zakarian ("Ovsanna") are ben-

eficiaries under life insurance policies insuring now-deceased Zare Zakarian ("Zare"):[1]

    1. Marie and Ovsanna are joint beneficiaries under a Prudential Insurance Company of America ("Prudential") policy.

    2. Marie is sole beneficiary under a Massachusetts Indemnity and Life Insurance Company ("Massachusetts Indemnity") policy.

Both insurers refused to pay death benefits under their policies, based on the insurers' having found Zare committed suicide. That led to the filing of this multi-count action (though the Complaint uses Roman numerals in designating the various counts, this opinion will employ Arabic numbers in the interests of simplicity).

Marie and Ovsanna initially sued Prudential for:

    1. breach of the insurance agreement (Count 7);

    2. breach of an implied covenant of good faith in carrying out that agreement (Count 8); and

    3. violation of Illinois Insurance Code § 155 ("Section 155," Ill.Rev.Stat. ch. 73, ¶ 767), applicable to vexatious and unreasonable action in denying benefits (Count 9).

On May 23, 1984 Judge Grady (to whom this case was previously assigned) dismissed Count 8 as preempted by Section 155 (in *"Zakarian I,"* 626 F.Supp. 420). Prudential now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56 as to Count 9.

Marie initially sued Massachusetts Indemnity for:

    1. breach of the insurance agreement (Count 1);

    2. breach of an implied covenant of good faith in carrying out that agreement (Count 2);

    3. intentional infliction of emotional distress (Count 3);

    4. punitive damages for wilful, wanton and reckless conduct in denying benefits (Count 4);

    5. negligent infliction of emotional distress (Count 5); and

    6. violation of Section 155 (Count 6). *Zakarian I* also dismissed Counts 2 and 4 on preemption grounds. Massachusetts Indemnity now moves for summary judgment as to Counts 3, 5 and 6.

For the reasons stated in this memorandum opinion and order, this Court:

    1. grants Massachusetts Indemnity's motion as to Counts 3 and 5 (the emotional distress claims);

    2. defers ruling on Massachusetts Indemnity's motion as to Count 6 and Prudential's motion as to Count 9 (both Section 155 claims) pending further submissions by defendants.

In any event the breach-of-contract claims (Count 7 as to Prudential and Count 1 as to Massachusetts Indemnity) were not the subject of defendants' motions and remain in the case.

### Facts[2]

On October 24, 1982 Prudential issued a one-year term life insurance policy providing $100,000 in life insurance benefits and $100,000 in accidental death benefits to Marie and Ovsanna upon Zare's death (Pru. Ans.Ex.A). That policy read in part:

**Suicide Exclusion.**—If the Insured, whether sane or insane, dies by suicide within two years from the issue date, we

---

**1.** Zare was Marie's son and Ovsanna's brother.

**2.** Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court must view the evidence in the light most favorable to the nonmovants— in this case Marie and Ovsanna (*Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)). Because of the nature of the claims at issue, attention should properly be focused only on information about Zare's death known to the insurers at the time

they denied plaintiffs' claims for insurance benefits. But as the factual summary will reflect, the parties have been of little assistance in identifying and separating out that information. Indeed, much of the information tendered on the current motions is not included in the text's statement of facts precisely because the insurers learned those facts *after* benefits were denied. For reasons dealt with later, still other information that appears to have been relied on by defendants in denying the claims is set out but is not now considered on the summary judgment motions as to the Section 155 claims.

will pay no more than the sum of the premiums paid.[3]

On December 16, 1982 Massachusetts Indemnity issued a 12–year life insurance policy providing $222,105 in death benefits to Marie upon Zare's death (Mass.Ex.C). That policy (like Prudential's) says only premiums (not death benefits) will be paid if the insured dies by suicide within two years from the policy's date of issue.

On August 26, 1983[4] Marie and her son James Zakarian ("James") found Zare's dead body in Zare's jewelry store (Sept. 14 police report in Mass.Ex. F). His wrists and the backs of his knees had been slashed (id.).

On September 19 Massachusetts Indemnity hired Equifax (a company providing investigative services) to complete a contestable death investigation, focusing on Zare's medical history (Brown Dep.Ex. 2 in Mass.Ex. B; Brown Dep. 71–72 in P.Ex. J). Equifax employee Karen Brown ("Brown")[5] then called Marie on the telephone, said she was from Massachusetts Indemnity and asked to meet with Marie to question her about Zare's death (Marie Dep. 157 in Mass.Ex. A). On October 4, before having read the police and Medical Examiner's reports of Zare's death (Brown Dep. 75 in Mass.Ex. B), Brown interviewed Marie in Marie's home (Marie Dep. 156 in Mass.Ex. A). During that first one to one-and-a-half hour meeting (id. at 158) nothing unpleasant happened. As Marie put it: "[Brown] was fine" (id. at 163–64).

Equifax's October 20 report[6] summarizes Brown's account of that meeting (Brown Dep.Ex. 5 in Mass.Ex. B) in essentially these terms:

1. Marie found Zare in his jewelry store in downtown Chicago with slashes and cuts on his body. It appeared to her to be a homicide with robbery as the motive, for there was jewelry missing.

2. Zare had been single and lived in Naperville for the last three years.

3. Zare had been hospitalized only once: in 1974 at Northwest Hospital, for kidney stones. He had seen no doctors other than Dr. Sanchez and had no health or mental problems.

Marie's October 4 signed statement confirms (Brown Dep.Ex. 7 in Mass.Ex. B) (quoted verbatim):

[Zare's] attending physician had been Dr. Sanchez in Chgo, however, I can't recall the last time he'd seen the doctor. To my knowledge he had not seen any other dr's in the last 10 years other than Sanchez. The only time he was hospitalized was in 1974 for kidney stones at the Northwest Hosp. He had had no out-pt treatment or ER treatment at any hosp. He had always been in excellent health & had no health problems.

Following that initial October 4 interview, Brown reviewed a Medical Examiner's report (Brown Dep. 104 in Mass.Ex.

3. [Footnote by this Court] There is a matching provision in the Accidental Death Benefit Rider.

4. Because virtually all the relevant dates after Zare's death were also in 1983, no further year designations will be included in the factual summary unless the date is in some other year.

5. Before February 1983 Brown was known as Karen Selers (see her actual signatures on the Equifax reports in Mass.Ex. B), though the court reporter spelled the name "Sellers" in transcribing her deposition (see, e.g., Brown Dep. 4–5 in P.Ex. H). In any case, this opinion has transposed all references to her to the name "Brown" to avoid confusion.

6. There is a series of Equifax reports summarizing the investigation at various stages (see Mass.Ex. B). Although Mass.Mem. 6–7 says the reports were mailed to Massachusetts Indemni-

ty, no affidavit supports that assertion. This Court's own reading of the reports suggests they are Equifax's internal reports, not necessarily (though they may have been) transmitted to the client. For example, the November 10 report concludes:

Other avenues of investigation will be discussed with the customer.

And two other reports (October 26 and November 9) summarize phone conversations between Equifax and Massachusetts Indemnity under the heading *CUSTOMER CONTACT.* Along the same lines, Mass.Mem. 7 says (again without evidentiary support) Equifax supplied Massachusetts Indemnity with copies of several documents such as police reports and medical records, by attaching them to the Equifax reports.

B [7]). It classified the "Type of incident" as "Apparent Suicide" and said (also quoted verbatim):

> Subject slashed his wrists and the back of his knees.... Subject had attempted self destruction about 3 weeks ago, when he took a overdose of aspirin. He was hospitalized at Evanston Hospital for about 5 or 6 days. He had seen a psychiatrist at this time, but did not follow up. James (brother) stated that the subject was despondent, but did not confide in his brother.

When Brown spoke with Dot Sanders ("Sanders") of Massachusetts Indemnity October 14 and told her of the information in that report, Sanders instructed Brown not to pursue the contestable medical history but instead to "do a suicide work-up" (Oct. 26 Equifax report, Brown Dep.Ex. 6 in Mass.Ex. B; Brown Dep. 108–09 in P.Ex. K). To that end Sanders and Brown agreed Brown would (1) again talk with Marie to try to develop a motive for Zare's actions and (2) get copies of the Evanston Hospital records (id.). But as Brown puts it, her job was not to reach a conclusion as to whether or not Zare had committed suicide, but instead simply to obtain information about Zare's manner of death and forward it to Massachusetts Indemnity (Brown Dep. 172 in P.Ex. P).

Before Brown's second meeting with Marie, Brown obtained and reviewed the Evanston Hospital medical records (Brown Dep. 173–74 in P.Ex. 0). They showed Zare had been admitted July 12 complaining of headache and of having ingested two bottles of Bayer Aspirin the night before (Mass.Ex. I). In the admitting physician's report (id.) "possible suicide" was listed as one of Zare's "problems." It went on (based on the emergency room chart and information from Zare's sister):

> [Patient] has been "down" since returning from vacation 1 week ago. He is quiet, withdrawn, poorly articulate single [male] who lives [with] his mother & sister. Family states he is generally noncommunicative; had a learning disability as a child. Has been especially withdrawn since his father was killed in Lebanon 8 yrs ago. Family states he has never attempted suicide, spoken of suicide or attempted drug overdose prior to this.

Next day consulting physician Dr. Teich wrote (id.):

> Denies present suicidal ideation. [Impression] need more info on [history]. Will call [mother]. Probable [diagnosis] is depression.
>
> Spoke later [with patient's mother] & sister. Their [history] is not conclusive. They report he has [complained of] "depression" for at least 2 yrs + of "impotence" for 5–6 yrs. More recently—1 [yr] ago—[patient's] close friend died in his house; hence [patient] will no longer live there. I feel that with such a vague [history] + poor cooperation from [patient] he must be evaluated in the [psychiatric] unit & will make an attempt to transfer him there.

In addition to those records Brown reviewed another investigator's summary of the police investigation into Zare's death (Brown Dep. 132 in Mass.Ex. B).[8] That investigator's summary said in essence:

---

**7.** There are two Medical Examiner reports in Mass.Ex. E. One (dated January 24, 1984 and entitled "Report of Postmortem Examination") classifies Zare's death as "Undetermined." But an August 14, 1984 Addendum at the bottom of that report says:

> In view of further information obtained from police, Area 1 violent crime, the manner of death is determined as suicide.

Of course that later report could not have been the one Brown reviewed in October 1983. From an October 26 Equifax report (Brown Dep.Ex. 6 in Mass.Ex. B) it is clear Brown's testimony refers to another (undated) Medical Examiner report entitled: "Medical Examiner's Case Report Cook County" (Brown Dep.Ex. 10 in Mass.Ex. B). Accordingly this opinion quotes from that latter report.

**8.** Brown said (id.) that summary was prepared by a "Mr. Isles." "C.L. Isles" is the name appearing at the bottom of an October 25 Equifax report (Brown Dep.Ex. 8 in Mass.Ex. B) summarizing the police investigation. According to that report, its information was obtained from an October 17 interview with Sergeant Glen (the senior officer on duty that day in the Area 1 Violent Crimes Unit) after he pulled Zare's file.

1. According to Police Sergeant Glen, the police investigation had been reclassified from a death investigation to a suicide due to information provided by Marie and Zare's brother James.

2. Marie and James gained entry into Zare's jewelry store (where they found his dead body) with a pass key. "The locks did not appear to be forced in any way [and] were still locked from the inside."

3. Zare had tried to commit suicide a few weeks prior to his death by taking an overdose of aspirin, and he had been hospitalized at Evanston Hospital for 5 to 6 days.

With that information in hand Brown met with Marie a second time on October 23 to try to develop a possible motive for suicide (Brown Dep. 111, 115–16 in P.Ex. K). Marie recalls Brown talking about three items during that half-hour meeting (Marie Dep. 163–64 in Mass.Ex. A):

1. Marie says (*id.* at 160) (quoted verbatim):

[Brown] said I didn't tell her that Zare was at the hospital sometime in June. I said, "You came in here with a bunch of questions. Whatever you asked me, I answered your questions. So you didn't ask me that, and I didn't answer. I didn't make it purposely, or I didn't hide it from you. Secondly, I cannot hide it, because the Prudential people paid his bill. How can I hide that from you?"

Marie mentions that discussion again (*id.* at 200–01):

A: And then she called me a liar because I didn't mention the hospital.

\* \* \*

Because the October 25 Equifax report was written after Brown's October 23 interview with Marie, if Brown *did* read a summary by Isles before that interview it had to be in some other document (likely the October 17 notes from which the October 25 report was prepared). Lacking that document, this opinion summarizes the account of Isles' investigation provided in the Equifax report itself.

**9.** P.Mem. 2 says Marie had not heard about Zare's impotence before Brown disclosed it, but

Q: And what words did she use? You said she called you a liar. What did she say?
A: She said, "You didn't tell me about the hospital. You hide it from me. Why did you hide it from me?"

2. Marie says Brown told her someone had been living in Zare's Naperville home and had died there—something Marie claims she had not heard before (*id.* at 160–61, 200).

3. Marie says (*id.* at 162) Brown asked: "Do you know that your son was impotent?" Marie then asked (*id.*) what the word "impotent" meant, to which Brown allegedly responded: "That he can't have sex." Marie says she was "totally shocked" by that disclosure (*id.* at 202) and "ready to collapse" (*id.* at 163).[9]

On that final subject Marie summarizes the rest of the October 23 conversation this way (*id.* at 162):

I said, "Where did you get that idea, or who gave you that idea?" She said, "Why don't you call the hospital, and you'll find out." I said, "I don't have to call anybody. That son was born from me, and I know what I raised." ... I said, "This is the end of our discussion. I have nothing more to tell you anymore. I don't want to talk to you anymore."

Marie says she then politely asked Brown to leave, and Brown did so (*id.* at 203).[10]

That meeting caused Marie to become emotionally distressed because in her words (*id.* at 199–200):

I was bothered from her. She hurt me very much.

\* \* \*

Marie's deposition does not contain such a direct statement (and see n. 14).

**10.** Although Brown does not recall the details of the meeting with Marie or how it ended (allegedly because the meeting took place over two years before Brown's deposition) (Brown Dep. 173–74 in Mass.Ex. B), she does remember she did not yell at or threaten Marie or accuse her of anything (*id.* at 252). Brown says she followed company procedure, which it to be polite and courteous (*id.*).

She hurt me because she told me, "Your son, he can't have sex." She's not asking me the question if you are aware of something like this with your son. She's telling me directly that she knows, that she was very sure, the way she was talking. That was bothering me very much.

Although the other two items Brown raised also bothered Marie, the impotency discussion was most upsetting (*id.* at 200–02). While Marie says she did not cry during the meeting, she says she started screaming after Brown left (*id.* at 163). Ovsanna, who saw Marie after the meeting, says (Ovsanna Dep. 191 in P.Ex. D):

[M]om was ready to overturn furniture and that kind of thing. She was not only upset, she was very angry.

When asked "Did you talk to any doctors about the fact that you were upset?" Marie responded "I was seeing a family counselor" (Marie Dep. 203 in Mass.Ex. A). Marie recalls seeing that counselor (at a cost of $5 per session) every week for about a year, beginning sometime after Zare had died until July 1984, when she began a new job (*id.* at 204–05, 207). Marie explains the reason for the therapy (*id.* at 95–96 in P.Ex. E):

Q: When you've talked before in your deposition, both today and before, about you being upset and about getting counseling and having an emotional problem that came out of this, was the—were you having the problem because Zare died?

A: Yes.

\* \* \*

Q: Is the reason you went to get counseling because you were upset that Zare had died?

A: Yes.

\* \* \*

Q: Is that the only reason you went to get therapy was because you were upset because Zare had died?

A: Yes.

Marie says she still speaks to the therapist by telephone once in a while (*id.* at 73).

According to a November 9 Equifax report (Brown Dep.Ex. 12 in Mass Ex. B), Sanders informed Equifax in a November 2 telephone conversation that Massachusetts Indemnity had sufficient information on which to decide Marie's claim. She therefore instructed Equifax not to interview the Evanston Hospital psychiatrist or Zare's brother, James, but to send her copies of the Medical Examiner's report and the Police Department's supplemental report (*id.*).

That same November 9 Equifax report says the police had reclassified the death investigation as a suicide and attaches a copy of the first page of the September 14 supplementary police report substantiating that reclassification.[11] Another November 10 Equifax report describes (and says it attaches) the Evanston Hospital medical records. It also gives Brown's description of the September 23 meeting with Marie (Brown Dep.Ex. 9 in Mass.Ex. B):

It should be noted that in reinterviewing the beneficiary, she was extremely hostile and did not care to discuss certain situations. She was also highly emotional throughout the interview, and was crying quite freely. For this reason, we were unable to obtain another statement from her, however, the results of our interview is as follows:

In trying to requestion the mother of the insured in regards to the circumstances of the death of the insured, she informed us that she did not care to discuss this any further. We pointed out to her that the police department and the medical examiners department had ruled the

---

11. Pages two and three of the supplementary police report (Mass.Ex. F) contain summaries of police interviews with Marie and James and the following conclusion (quoted verbatim):

The reporting detectives investigation showed no signs of a crime being committed and received indications from both the scene and

the background of the subject from close family members showes that this incident is a Suicide and the reporting is requesting that at this time this case be reclassified from a death investigation to a Suicide and that this matter be Cleared and Closed as a Non-Criminal incident.

death as a suicide and she stated "you can believe whoever you want to believe".

We then questioned her once again about her son's past medical history and she informed us that she had given all of this in the initial interview. We pointed out to her that we were aware of the fact that he was in Evanston Hospital. Stated that she had forgotten about this because it was nothing important and he had been in there solely for gastritis. However, we pointed out to her that the medical records list the reason for confinement as aspirin overdose and she stated that "that is a lie".

Denied that her son had been depressed or despondent. Also denied that he was having any type of problems with his job or his work. When we pointed out the fact that this stated in the medical record she once again informed us that "the doctors are all lying".

We also questioned her as to the residence of her son. Informed us that he had been living in the house in Naperville. We pointed out the fact that his residency on the hospital records was listed at her address in Skokie. She stated that he would occasionally stay with her and since he became sick while at her house this was the address that he used. Denied the fact that a close friend had died in the house in Naperville approximately a year ago and this was the reason why he was staying with her.

Insisted throughout the interview that her son had been happy and well adjusted with no emotional problems. However, it should be noted that she never actually denied that he committed suicide, however, stated we could just believe whatever we wanted to believe and ⸱

would not discuss this aspect any further. As stated, she was crying through the majority of the interview and was quite hostile and for this reason a statement was not taken. We consequently concluded the interview at this time.

On November 22 Massachusetts Indemnity wrote Marie, advising her (Mass.R. Mem.Ex. A):

The general provisions portion of the contract states that the liability of the Company is limited to the amount of premiums paid if death is due to suicide within two years from the date of issue.

In reviewing the medical information and documents in file, the circumstances surrounding the demise of Mr. Zakarian appear to apply to this provision of the policy.

In view of this information, Mrs. Zakarian, we will be refunding the premiums paid on the policy.[12]

So much, then, for the facts relevant to the case against Massachusetts Indemnity.

Precisely what information Prudential relied on in denying benefits to Marie and Ovsanna is far from clear. It appears R.H. Froese ("Froese") conducted an investigation on Prudential's behalf, the results of which are summarized in a November 4 report (P.Ex. T).[13] In capsule form the report reflects this:

1. On October 18 Froese reviewed Evanston Hospital medical records. He also interviewed Dr. Teich, but the doctor did not feel qualified to give a statement as to whether Zare had suicidal intentions at any time. Dr. Teich did say he spoke at length with Zare's family, urging further treatment. They refused.

2. On October 19 Froese interviewed Marie and Ovsanna.[14] Marie and Ovsan-

---

**12.** [Footnote by this Court] Massachusetts Indemnity had notified Marie by letters dated October 11 and November 3 that it was in the process of reviewing the claim for benefits (*id.*).

**13.** Plaintiffs (and not Prudential) have provided this Court with that report, entitled "[Prudential] L & H Claim Division, MARH Inspection Report" followed by Froese's name and then the abbreviation "H.O.R."

**14.** In part the summary of that meeting reads: There was a razor along side [Zare].... His sister went on to state and indicate that it was strange a razor should be present, as the insured who fabricated jewelry worked with sharp knives in his trade. Subsequent to this, the sister indicated jewelry items were missing, several of them quite valuable pieces.
　　*　　*　　*　　*　　*　　*

na vehemently denied Zare had any suicidal tendencies and rejected any notions of suicide.

3. On October 24 Froese obtained the police report, but the narrative portion had been deleted and he was unable to speak to the police officers involved. Because the Medical Examiner's report had not yet been typed, Froese was unable to obtain that record.

There is no indication from the Prudential exhibits as to whether it conducted any further investigation before denying Marie and Ovsanna benefits,[15] or even as to the date it denied those benefits.

### Plaintiffs' Claims

Marie and Ovsanna have charged, as the predicate acts for the Section 155 claim against Prudential (Complaint Count 8 ¶ 16, incorporated by reference into Count 9):

(a) It failed to reasonably and adequately investigate the merits of the plaintiffs' claim before rejecting the claim.

(b) It has refused and continues to refuse to provide any reasonable basis for its rejection of the claim, a reasonable interpretation of the provisions of the policy in question or a reasonable application of those provisions to the plaintiffs' claim.

(c) It has acted and continues to act to protect its own financial interest at the expense of the interest of the plaintiffs.

We questioned them as to whether or not there were any visible signs of forced entry, ... [or] any noticeable indication of a struggle ... to which they responded negatively.

\* \* \* \* \* \*

The questioning was pursued regarding [Zare's] depression as indicated in the hospital record at Evanston.... I informed them the record also indicated he returned from vacation recently and that a close friend had died in his home in Naperville a year ago and that he would no longer live there. They stated he was upset with his friend's death, but maintained he lived there.... I also mentioned the history indicated an impotency problem to which both responded, he had a few problems but would not elaborate on these, stating only they had been resolved.

(d) It has, during the course of the plaintiffs' mourning and grief, required the plaintiffs to undergo ongoing cross-examination sessions in an effort to persuade them that there was no basis for their claim.

(e) It has, by its action, required the plaintiffs to retain an attorney to initiate litigation to recover the death benefit under the insurance policy in question.

Marie has charged Massachusetts Indemnity with having committed those same acts as the predicate for her Section 155 and emotional distress claims (as well as the previously-dismissed claims). In addition Marie has alleged (Complaint Count 2 ¶ 16, incorporated by reference into Count 6):

(e) [Massachusetts Indemnity] has, during the course of [Marie's] mourning and grief, conducted an interview with the plaintiff mother where it labeled her dead son impotent, psychotic, a liar and mentally ill and charged the plaintiff with the interposition of a false claim.[16]

This opinion treats first with the emotional distress claims (Counts 3 and 5) against Massachusetts Indemnity and then turns to the Section 155 claims against both defendants (Counts 6 and 9).

### Emotional Distress Claims

Mass.Mem. levels a dual attack against the emotional distress claims:

1. Those claims are preempted by Section 155.

If Froese's and Brown's reports are accurate, Froese spoke with Marie about Zare's impotency (and the death in the Naperville home) before Brown did. That of course bears on Marie's claim she did not know about those matters before the meeting with Brown (see n. 9 and associated text).

**15.** For example, nothing submitted on the current motion indicates whether Prudential had then obtained the supplemental police report reclassifying Zare's death as a suicide.

**16.** [Footnote by this Court] Counts 6 and 9 (the latter already quoted in the text) assert the identical insurer conduct in both counts' allegations (a) through (d), but Count 6's allegation (f) matches Count 9's already-quoted allegation (e).

2. In any event, Massachusetts Indemnity's conduct was not outrageous. Additionally, Mass.Mem. 24 urges the negligent-infliction-of-emotional-distress claim is meritless because Marie has not alleged her emotional distress arose out of fear of physical impact.

### 1. *Preemption*

Section 155 permits certain extraordinary costs [17] to be taxed against an insurer:

(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable....

Mass.Mem. 13 notes *Zakarian I* granted "Defendants' Motions to Dismiss Counts II, IV and VIII" on preemption grounds and therefore reasons (Mass.R.Mem. 10):

Counts III and IV [sic—should be V] were not before Judge Grady. However, the same analysis applies to the issue of preemption and Counts III and IV [sic].[18]

*Zakarian I*, 626 F.Supp. at 422 first recapitulated the split in the Illinois appellate courts over the preemptive effect of Section 155 on common law actions seeking compensatory and punitive damages for breach of the duty of good faith and fair dealing. Then Judge Grady found plaintiffs' claims seeking such damages preempted because (*id.*):

[I]f faced with this question, the Illinois Supreme Court would decide that both compensatory and punitive damage actions are preempted by the Illinois Insurance Code.

■ This Court is now faced with a different issue: whether Section 155 preempts emotional distress claims. Unlike Judge Grady, this Court has long adhered (as *Erie v. Tompkins* requires) to the Illinois "internal" choice-of-law rule, under which each state trial court (and hence each federal trial court in a diversity case) is bound to follow the decisions of the Appellate Court *in its own district* when the Appellate Districts diverge.[19] Because this case was removed from the Circuit Court of Cook County, here the law as expounded by the First Appellate District controls.

That doctrine compels examination of *Combs v. Insurance Co. of Illinois*, 146 Ill.App.3d 957, 100 Ill.Dec. 525, 497 N.E.2d 503 (1st Dist.1986), which appears to be the only First Appellate District case addressing the preemptive effect of Section 155 on emotional distress claims.[20] There the

---

**17.** Those items (to be taxed as costs) are specified in these terms:

reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
1. 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
2. $25,000;
3. the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

**18.** [Footnote by this Court] To find out just *why* Counts 3 and 5 "were not before Judge Grady" in that motion (as would normally be expected if the same preemption rationale applies), this Court's law clerk did some investigative work. What she discovered (from the docket sheet and official court file) is that Massachusetts Indemnity never actually filed a motion to dismiss even Counts 2 and 4 on preemption grounds. Instead Prudential moved on February 3, 1984 to dismiss Count 8 for that reason, and on April

13, 1984 Judge Grady granted Massachusetts Indemnity leave to join in *that* motion.

**19.** This Court's numerous opinions on the application of *Erie v. Tompkins* principles where there is a division of views among Illinois Appellate Districts (see, e.g., *Abbott Laboratories v. Granite State Ins. Co.*, 573 F.Supp. 193, 196–200 (N.D.Ill.1983) (coincidentally dealing with Section 155 preemption) and, most recently, *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1131–33 (N.D.Ill.1986)) explains why this Court eschews the Supreme-Court-predictive approach.

**20.** Although a claim of intentional infliction of emotional distress was also asserted in *Tobolt v. Allstate Ins. Co.*, 75 Ill.App.3d 57, 30 Ill.Dec. 824, 393 N.E.2d 1171 (1st Dist.1979), the court dismissed that claim on the merits without addressing Section 155's preemptive effect. There plaintiffs alleged Allstate's refusal to pay for losses due to a fire in their home had caused emotional distress because:
1. They fell more heavily in debt and therefore had to borrow money, accept gifts and depend on the help of relatives.

plaintiff alleged a delay in payment of insurance proceeds caused his financial condition to deteriorate, and that in turn caused him great mental anguish and stress (*id.* at 960, 100 Ill.Dec. at 550, 497 N.E.2d at 528). In support of his claim of intentional infliction of emotional distress, plaintiff alleged (*id.* at 963, 100 Ill.Dec. at 552, 497 N.E.2d at 530):

1. defendants (an insurer and its adjuster) had a duty to deal fairly with plaintiff;

2. two losses to plaintiff's home (caused by winter weather and fire) forced him to find temporary housing and to incur expenses leading to his becoming impoverished;

3. defendants were told of his impoverished condition;

4. plaintiff's claims were improperly adjusted;

5. the insurer refused to pay certain claims and offered to pay an amount less than plaintiff sought on other claims;

6. defendants delayed in paying an undisputed amount, forcing plaintiff to take out a loan;

7. when told of plaintiff's impoverished condition, the insurer's agent made a statement to the effect that plaintiff was now in a situation that would force him to accept whatever was offered.

Faced with those allegations as the basis for plaintiff's claim, *Combs* found that claim preempted (*id.* at 963–64, 100 Ill.Dec. at 552, 497 N.E.2d at 530) (emphasis in original):

Stripped of its legal conclusions, plaintiff's amended Count III [for intentional infliction of emotional distress] clearly frames the allegations in terms of a breach of a duty of good faith. As such, the basis of the allegations remains grounded in unreasonable and vexatious refusal or delay in paying the insurance proceeds. The conduct alleged in Count III is therefore the same as that governed by section 155. Having already established that *any* count alleging nothing more than the conduct proscribed by section 155 is pre-empted by the statute, we must conclude that the trial court properly dismissed Count III of plaintiff's amended complaint.

P.Mem. 5–6 reads *Combs* to mean Section 155 preempts only claims "premised on delay and the inconveniences attending delay." That, plaintiffs say, permits the assertion of their "separate, independent and intentional tort...." But that reading, though partly right, is somewhat overbroad. Although Section 155 is not a model of clarity, a careful parsing of its language discloses its intended thrust. It applies to two kinds of "actions" (that is, lawsuits)—to "any action by or against a company" (the only place where the word "action" is used in defining the statute's scope):

1. that places in issue the liability of the insurance company on a policy or the amount of the loss payable under a policy; *or*

2. "for an unreasonable delay in settling a claim," if it also appears to the court that "such action *or* delay" is vexatious and unreasonable.

Thus the statutory reference to any "action" being vexatious and unreasonable must be to a *lawsuit*,[21] not to insurer *conduct* as such (a different meaning of "action" entirely). It follows then that, apart from a vexatious lawsuit itself, the only insurer conduct embraced by Section 155 is "delay"—just as plaintiffs urge.

That, however, is not the end of the analysis. *Combs* teaches it is not the legal

_____

2. They were threatened with a lawsuit for nonpayment of motel bills.

3. Their credit had been severely damaged because of late and non-payment of bills. Plaintiffs also sought compensatory and punitive damages for Allstate's failure to act in good faith. *That* claim was dismissed on preemption grounds.

**21.** Presumably that would most likely refer to an "action"—a lawsuit—brought *by* rather than *against* a company, though it is unnecessary to decide whether that is the only possible application of that branch of Section 155.

theory Marie asserts (be it intentional or negligent infliction of emotional distress) that determines Section 155's preemptive effect. Instead this Court must look beyond such legal theories to the predicate acts or conduct forming the basis for that claim. If the alleged conduct is within the scope of Section 155, then the claim is preempted.

*Combs* found plaintiff was alleging intentional infliction of emotional distress by the insurer's unreasonable and vexatious refusal to pay, or delay in paying, insurance proceeds. "Refusal" *is* of course a permanent and total "delay" (the statutory term). Because such unreasonable and vexatious conduct is thus covered by Section 155, the court held the emotional distress claim preempted. Here Marie has alleged Massachusetts Indemnity intentionally and negligently inflicted emotional distress through conduct described in the language the "Plaintiffs' Claims" section of this opinion has already quoted from the Complaint. As in *Combs*, what this Court must determine to resolve the preemption issue is whether that conduct is unreasonable and vexatious "delay" for which Section 155 provides relief.

■ On that score it is instructive that Marie herself (by incorporating the same allegations into Complaint Count 6) cites the very same conduct as the basis for the Section 155 claim. Indeed Massachusetts Indemnity's alleged failure to investigate the merits of Marie's claim reasonably and adequately before rejecting it (allegation (a)) certainly falls squarely within Section 155, as does the conduct in allegations (b), (c), (d) and (f).

■ That analysis does not extend, however, to Massachusetts Indemnity's alleged conduct (through Brown) during the October 23 interview with Marie (allegation (e)): calling Zare impotent, psychotic, a liar and mentally ill and charging Marie with filing

a false claim.[22] That is not a delay-oriented claim, but a truly independent one.

Except for allegation (e), then, this Court finds Marie has alleged Massachusetts Indemnity's intentional and negligent causation of her emotional distress through conduct embraced by Section 155. Following *Combs*, this Court dismisses those covered claims on preemption grounds. But though allegation (e) thus survives the preemption inquiry, it falls at the next hurdle (which would also trip up all the preempted claims as well).

2. *Intentional Infliction of Emotional Distress*

*Debolt v. Mutual of Omaha*, 56 Ill. App.3d 111, 113, 13 Ill.Dec. 656, 658, 371 N.E.2d 373, 375 (1st Dist.1978) sets out four elements of the tort for intentional infliction of emotional distress:

(1) extreme and outrageous conduct, (2) intent by the defendant to cause, or a reckless disregard of the probability of causing[,] emotional distress, (3) severe or extreme emotional distress suffered by the plaintiff, and (4) an actual and proximate causation of emotional distress by the defendant's outrageous conduct.

Though it seems doubtful whether *any* of those four requirements is satisfied by Marie's charges here, this opinion need reach only the first requirement to dispose of her claim.

Brown's allegedly "outrageous" conduct consists of comments made during the half-hour October 23 meeting with Marie:

1. accusing Marie of hiding information from Brown during the October 4, 1983 interview (and assertedly calling Marie a liar[23]);

2. telling Marie someone had been living in Zare's Naperville home and had died there;

<hr>

22. There is no evidence to support the allegations Brown (1) labeled Zare "psychotic, a liar and mentally ill" or (2) charged Marie with filing a false claim.

23. Marie's deposition testimony does not support the charge Brown actually used the word "liar." What Brown reportedly spoke of was Marie's not having told about Zare's hospital stay ("You hide it from me").

3. saying: "Do you know that your son was impotent?"

Though P.Mem. 4 says Marie was still grieving Zare's death, those comments do not constitute (*Public Finance Corp. v. Davis*, 66 Ill.2d 85, 90, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976), quoting *Restatement (Second) of Torts* § 46 comment d (1965)):

> conduct ... so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency....

Just what constitutes "outrageous" conduct was examined in *Public Finance*, a case analogous to this one in some respects and still the leading Illinois Supreme Court decision on the subject. There plaintiff alleged (among other things) the defendant debt collector had (66 Ill.2d at 90–91, 4 Ill.Dec. at 655, 360 N.E.2d at 768):

> 1. called her several times weekly (frequently more than once a day)—and even at the hospital after she had requested he not call her there because she was staying with a severely-sick child and was herself sick and nervous;
>
> 2. one day refused to leave her home until her son had to come into the room;
>
> 3. induced her to write a check (promising it would not be processed), then phoned plaintiff's acquaintance and told her plaintiff was writing bad checks.

Despite those shabby collection tactics, the Supreme Court found such conduct not outrageous (*id.* at 92, 4 Ill.Dec. at 655, 360 N.E.2d at 768) (citations omitted):

> [Plaintiff] was legally obligated to [defendant] and was in default in making the payments. As stated in Restatement (Second) of Torts, section 46, comment *g*, in such a case the actor is not liable "where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistance [sic] is certain to cause emotional distress." A creditor must be given some latitude to pursue reasonable methods of collecting debts even though such methods may result in

some inconvenience, embarrassment or annoyance to the debtor....

\* \* \*

> In cases wherein courts have permitted the action to be brought or have sustained recovery for severe emotional distress, the collecting tactics of the creditor have involved the use of abusive and vituperative language, shouting and railing at the debtor, repeated threats of arrest and ruination of credit, threats to appeal to the debtor's employer to endanger his employment and accusations of dishonesty. "[L]iability usually has rested on a prolonged course of hounding by a variety of extreme methods."

Like the debt collector in *Public Finance*, Massachusetts Indemnity certainly had a legitimate reason for pressing Marie about the circumstances surrounding Zare's death even though that might disturb Marie: If Zare had committed suicide, Marie was not entitled to death benefits. And surely Brown's conduct was nowhere near as objectionable as that alleged in *Public Finance*. Brown's allegedly "outrageous" conduct took place in a *single* meeting with Marie lasting one-half hour. And Marie herself concedes Brown stopped questioning her and ended the interview as soon as Marie asked that she do so.

Although Brown did raise some sensitive subjects during that half-hour meeting, those subjects (Zare's impotency and the death of his friend in the Naperville home) were undeniably relevant to a possible suicide motive. And P.Mem. does not dispute that Brown had reason to believe Marie already knew about assertions as to Zare's impotency and the Naperville home death (as she well may have, see n. 14). That leaves only the allegation Brown accused Marie of hiding information—and perhaps called Marie a "liar." But the first of those cannot be characterized as "outrageous" in light of Brown's belief that Marie had failed to make full disclosure (or had even made misleading disclosures) in their first meeting. And *Combs*, 146 Ill. App.3d at 964, 100 Ill.Dec. at 531, 497 N.E.2d at 509 teaches such an isolated

(though perhaps inappropriate) statement is simply insufficient to support an intentional-infliction-of-emotional-distress claim.

■ Under the circumstances this Court finds the conduct of Massachusetts Indemnity (through Brown) was not "outrageous" in the legal sense. That defeats Marie's claim of intentional infliction of emotional distress in its entirety. This opinion now turns to the merits of her negligent-infliction-of-emotional-distress claim—which (not surprisingly) proves equally deficient.

3. *Negligent Infliction of Emotional Distress*

It would seem odd indeed if injurious conduct, legally nonactionable though intentionally inflicted, could ground an action if such conduct were merely negligent. This Court could thus well reject Marie's negligent-infliction claim in simple a fortiori terms. There is, however, still another (and independent) basis for reaching the same result that bears brief mention.

■ *Rickey v. Chicago Transit Authority*, 98 Ill.2d 546, 555, 75 Ill.Dec. 211, 215, 457 N.E.2d 1, 5 (1983) held a bystander who had allegedly suffered only emotional distress (unaccompanied by any physical impact or injury) from witnessing a close relative's negligently-caused injury could recover for negligent infliction of emotional distress if the bystander:

1. were in such proximity to the accident (in the "zone of physical danger") that there was a high risk of physical impact to the bystander and

2. suffered physical injury or illness as a result of the emotional distress.[24]

Marie has charged Massachusetts Indemnity with negligent infliction of emotional distress via the same conduct asserted as the basis for the intentional-infliction claim. But as Mass.Mem. 24 argues (and P.Mem. 5 concedes), Marie has not alleged either (1) fear of physical impact or (2) physical inju-

ry resulting from her emotional distress. Accordingly *Rickey* is independently fatal to the negligent-infliction-of-emotional-distress claim. Accord, *Courtney v. St. Joseph Hospital*, 149 Ill.App.3d 397, 402–03, 102 Ill.Dec. 810, 815, 500 N.E.2d 703, 707 (1st Dist.1986) (denying widow's negligent-infliction-of-emotional-distress claim based on mishandling of husband's corpse that prevented an open-casket wake and funeral).

*Section 155 Claims·*

Marie and Ovsanna have alleged both Massachusetts Indemnity and Prudential acted unreasonably and vexatiously in violation of Section 155 through the now-familiar conduct quoted earlier in this opinion. For convenience this Court summarizes (in a streamlined fashion) that conduct here:[25]

1. failing reasonably to investigate, and then unreasonably denying, plaintiffs' claims;

2. conducting "ongoing cross-examination sessions" to persuade plaintiffs they had no basis for their claims; and

3. (as to Massachusetts Indemnity only) questioning Marie during Brown's October 23 interview.

Neither the second nor the third of those allegations requires serious consideration. They will therefore be touched on briefly before returning to the first claim.

■ Nothing in the evidence supports the second contention as to Prudential. Froese conducted but a single interview with plaintiffs. According to Marie (Marie Dep. 111 in Pru.Ex. G), "He didn't stay that long." Ovsanna estimates the interview lasted twenty minutes to one-half hour (Ovsanna Dep. 203 in Pru.Ex. H). Nor is there any evidence suggesting Froese attempted to induce plaintiffs to drop their claims during that interview. Actually plaintiffs say they do not recall what was said during the interview (Marie

---

24. *Rickey* resulted in a remand because it was unclear whether plaintiff could satisfy those two requirements.

25. Allegations (c) and (e) are really cumulative, flowing from the other alleged misconduct.

Dep. 109–10, 120 in Pru.Ex. G; Ovsanna Dep. 202 in Pru.Ex. H).

■ Plaintiffs fare no better on their like claim against Massachusetts Indemnity. It (through Brown) conducted two interviews with Marie lasting (together) not more than two hours. At no time during her deposition does Marie indicate Brown tried to convince Marie she did not have a claim during either interview.

■ As for the third predicate for the Section 155 claims (Brown's conduct during the October 23 interview), Marie cannot succeed for two reasons. First, the very fact that negated Section 155 preemption of the emotional-distress claims based on that conduct—its non-coverage by Section 155—by definition means the conduct is not actionable under that statute. Second, even if it were, this opinion's earlier analysis compels the conclusion that Massachusetts Indemnity (through Brown) did not act unreasonably or vexatiously during that interview.

That leaves only the first allegation: Each defendant failed reasonably to investigate, and then unreasonably denied, plaintiffs' claims. If that were true, each defendant certainly violated Section 155. But to determine that issue, this Court must know precisely what information (about Zare's manner of death) each defendant knew and relied on in denying plaintiffs' claims.

As this opinion's factual summary has reflected, both Prudential and Massachu- setts Indemnity have left this Court largely to guess (or make assumptions) in that regard. Both have provided this Court with a multitude of documents tending to show Zare committed suicide, forgetting those documents are relevant only if defendants reviewed them before denying plaintiffs' claims. Until this Court is provided evidence identifying the information or documents relied on to decide the claims,[26] it cannot decide whether or not either defendant violated Section 155. Ruling must be deferred on defendants' summary judgment motions as to Counts 6 and 9, pending further submissions by defendants.

■ One caveat is in order as a prelude to those submissions. If either or both defendants proves or prove reliance on police reports classifying Zare's death as a suicide, this Court is prepared to grant it or them summary judgment as to the Section 155 claims. P.Mem. 11 is totally off the mark in urging defendants acted unreasonably if they relied on that police department finding, simply because plaintiffs think the police failed to investigate adequately.

Plaintiffs in effect ask this Court to require insurance companies to second-guess police investigations by conducting their own independent detective work to determine whether the police findings are correct.[27] Only then, plaintiffs would have it, may an insurer decide a claim. That is patently absurd and certainly not mandated

---

**26.** For example, no Rule 56 affidavits have been provided by the actual decisionmakers reciting the documents they reviewed before denying benefits. On a related point, it is really irrelevant whether (as Plaintiffs' September 29, 1986 Motion To Strike Defendants' Motion for Partial Summary Judgment asserts) those decisionmakers relied on hearsay or documents lacking a proper foundation. After all, insurance companies (unlike this Court) are not governed by courtroom evidentiary rules. Human beings (and thus corporations) make important (and rational) decisions every day on the strength of hearsay evidence. Whether either insurer acted unreasonably or vexatiously in deciding Zare committed suicide (and thus in denying his beneficiaries death benefits) is a function of the quality and reliability of the information relied on, not the Federal Rules of Evidence as such. Of course, under Fed.R.Civ.P. 56(e) defendants must follow those rules in tendering to this Court the information it needs to make its decision.

**27.** Because (it appears) defendants chose here to rely on the results of the police investigation, plaintiffs ask this Court to turn detective and find (1) the police failed to conduct an adequate investigation and therefore erred in concluding Zare committed suicide and (2) each defendant therefore acted unreasonably in relying on that investigation instead of conducting its own independent investigation.

by Section 155's reasonableness requirement.[28]

In sum, this Court is prepared to rule that either defendant that establishes it denied plaintiffs' insurance claims in reliance on police findings that Zare committed suicide was reasonable in doing so. Any other information defendants may have relied on in making that decision (e.g., the Medical Examiner's report or the Evanston Hospital records) would simply be icing on the cake.

### Conclusion

There are no genuine issues of material fact as to Counts 3 and 5, and Massachusetts Indemnity is entitled to a judgment on those claims as a matter of law. Those Counts are dismissed. Ruling on defendants' summary judgment motions as to Counts 6 and 9 is deferred until this Court receives further submissions on the subjects identified in this opinion. Those submissions shall be filed on or before February 3, 1987. This case is set for a status hearing (and, barring unforeseen difficulties, for final decision on defendants' motions) February 27, 1987 at 9 a.m.

### SUPPLEMENT TO OPINION

This Court's January 20, 1987 memorandum opinion and order (the "Opinion")[1] deferred ruling, pending further submissions by Massachusetts Indemnity and Prudential, on their motions for summary judgment on plaintiffs' Section 155 (Illinois Insurance Code) claims. Those claims are grounded on the notion that each defendant failed reasonably to investigate, and then unreasonably denied, plaintiffs' insurance claims. In Opinion at 1140 (footnote omit-

ted) this Court concluded it could not finally resolve those Section 155 claims without further input from defendants:

But to determine that issue, this Court must know precisely what information (about Zare's manner of death) each defendant knew and relied on in denying plaintiffs' claims.

As this opinion's factual summary has reflected, both Prudential and Massachusetts Indemnity have left this Court largely to guess (or make assumptions) in that regard. Both have provided this Court with a multitude of documents tending to show Zare committed suicide, forgetting those documents are relevant only if defendants reviewed them before denying plaintiffs' claims. Until this Court is provided evidence identifying the information or documents relied on to decide the claims, it cannot decide whether or not either defendant violated Section 155.

Now each defendant has provided that missing information. Massachusetts Indemnity has submitted the affidavit of Lawrence Rusinyak, in which he says (¶ 2) he "had final authority in denying" Marie's claim. And Prudential has submitted the affidavit of John M. Cioffi, Jr., in which he says (¶ 3) he "personally made the decision to deny" plaintiffs' claims. Each decisionmaker says he concluded Zare had committed suicide, and he therefore denied the insurance proceeds to plaintiffs, based on the following documents (among others):

1. Chicago Police Department records closing the Department's investigation based on a finding Zare had committed suicide;

2. Evanston Hospital records (a) showing Zare had been treated for an

**28.** It is of course conceivable (though a remote possibility) that, under some circumstances, knowledge already in the possession of an insurer could cast enough doubt on police findings to render the insurer's reliance on those findings unreasonable. Nothing in this case even hints at such a possibility here. Indeed, if "unreasonable" and "vexatious" are to be given separate content rather than being treated as synonyms (cf. *Robertson v. Travelers Ins. Co.*, 95 Ill.2d 441, 449–50, 69 Ill.Dec. 954, 958–59, 448 N.E.2d 866, 870–71 (1983) (distinguishing be-

tween those terms when stated in the disjunctive—rather than, as here, in the conjunctive)), it is well-nigh impossible to conceptualize a situation in which an insurer's turndown of coverage on the strength of a police finding of suicide could be termed "vexatious."

**1.** This opinion will (1) assume familiarity with the factual statement in the Opinion and (2) follow the same usage of defined terms.

aspirin overdose in July 1983 and (b) saying he had been depressed for over two years;

3. Medical Examiner's Report showing the cause of death as slash wounds to the wrist and the back of the knees.

 As Opinion at 1140–41 made clear, this Court has concluded defendants would have acted reasonably in denying plaintiffs' insurance claims if they had relied on police findings that Zare had committed suicide. Each defendant has now shown it relied on those police findings—and much more. Such justifiable reliance is conclusive in compelling the rejection of plaintiffs' Section 155 claims against each defendant.

### Conclusion

There are no genuine issues of material fact as to either of Counts 6 and 9. Accordingly Massachusetts Indemnity is entitled to a judgment on Count 6, and Prudential on Count 9, as a matter of law. Those two counts are dismissed with prejudice.[2]

**2.** After this opinion had already been prepared, this Court received a February 19 letter from plaintiffs' counsel requesting "permission to file a response to the defense position seasonably [ ] after" plaintiffs' principal attorney completes a trial now in progress. However, the context in which the issue is before this Court—a motion for partial summary judgment, with all precincts having been heard from in terms of the *evidence* to be considered in deciding the motion—does not call for further input from counsel. There either is or is not a genuine issue of material fact on the Section 155 claims, and the Opinion had already made clear how that question was to be resolved. Accordingly the request is denied.